# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ERIE
------------------------------------------------------------------X

LAUREN HAIDON

                              Plaintiff/Petitioner,


          - against -                              Index No. 805815/2019


FENSTER ENTERPRISES, INC., NATIONAL BUILDING
PRODUCTS, INC., NATIONAL BUILDING PRODUCTS
AND SERVICES, INC. f/k/a PELLA PRODUCTS, INC.,
HERBERT A. KRIEGH, YOMI OJO, and
GRETCHEN CORDONNIER
                              Defendant/Respondent.
------------------------------------------------------------------X
                    NOTICE OF ELECTRONIC FILING
                          (Mandatory Case)
                        (Uniform Rule § 202.5-bb)

          You have received this Notice because:

                    1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the
                    New York State Courts E-filing system ("NYSCEF"), and

                    2) You are a Defendant/Respondent (a party) in this case.

          If you are represented by an attorney:
          Give this Notice to your attorney.  (Attorneys: see "Information for Attorneys" pg. 2).

          If you are not represented by an attorney:
          You will be served with all documents in paper and you must serve and file your
          documents in paper, unless you choose to participate in e-filing.

          If you choose to participate in e-filing, you must have access to a computer and a
          scanner or other device to convert documents into electronic format, a connection
          to the internet, and an e-mail address to receive service of documents.

          The benefits of participating in e-filing include:

                         ! Serving and filing your documents electronically

                         ! Free access to view and print your e-filed documents

                         ! Limiting your number of trips to the courthouse

                         ! Paying any court fees on-line (credit card needed)

          To register for e-filing or for more information about how e-filing works:

          ! Visit: www.nycourts.gov/efile-unrepresented or

! Contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

Information for Attorneys
(E-filing is Mandatory for Attorneys)

An attorney representing a party who is served with this notice must either:

1) Immediately record his or her representation within the e-filed matter on the NYSCEF site www.nycourts.gov/efile ; or

2) File the Notice of Opt-Out form with the clerk of the court where this action is pending and serve on all parties. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the knowledge to operate such equipment. [Section 202.5-bb(e)]

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).


Dated:  May 10, 2019


Matthew D. Miller, Esq.                           1600 Liberty Building, 424 Main Street
Name                                              Address

Rupp Baase Pfalzgraf Cunningham LLC               Buffalo, New York 14202
Firm Name


                                                  (716) 854-3400
                                                  Phone

                                                  miller@ruppbaase.com
                                                  E-Mail


To:     Fenster Enterprises, Inc.                 National Building Products, Inc.

        3507 Olive Road, Ste. F                   3507 Olive Road, Ste. F

        South Bend, Indiana 46628                 South Bend, Indiana 46628

        National Building Products and Services, Inc.
        f/k/a Pella Products, Inc.

        345 Enterprise Way

        Pittston, PA 18640

Herbert A. Kriegh

811 Parkview Road

Moscow, PA 18444

Yomi Ojo

142 Sussex Street

Old Forge, PA 18518

Gretchen Cordonnier

120 Fox Run Circle

South Abington TWP, PA 18477

Gretchen Cordonnier

1882 Dalton Road

Factoryville, PA 19419

Case 1:19-cv-01010-LJV-JJM   Document 1-1   Filed 07/31/19   Page 6 of 46   INDEX NO. 805815/2019

STATE OF NEW YORK
SUPREME COURT : COUNTY OF ERIE

LAUREN HAIDON,

                              Plaintiff,

        vs.                                                        Index No.:

FENSTER ENTERPRISES, INC., NATIONAL
BUILDING PRODUCTS, INC., NATIONAL
BUILDING PRODUCTS AND SERVICES, INC.
f/k/a PELLA PRODUCTS, INC.,
HERBERT A. KRIEGH, YOMI OJO, and
GRETCHEN CORDONNIER,

                              Defendants.

_____

## **SUMMONS**

**TO DEFENDANTS:**

        **YOU ARE SUMMONED** to appear in this action by serving your answer to the
complaint on plaintiff's attorney within the time limits stated below.

        Erie County is designated as the county where this action will be tried, because
one or more of the parties to this action has a residence in that county.

        **TIME LIMITS TO ANSWER:**

        (1)     If this summons is <u>served by delivery to you personally</u> within
New York State, you must answer the complaint within TWENTY (20) days after such delivery,
exclusive of the day of service.

        (2)     If this summons is <u>not served by delivery to you personally</u> within
New York State, and not served pursuant to CPLR 312-a, you must answer the complaint within
THIRTY (30) days after service is complete.

        (3)     If this summons is served pursuant to CPLR 312-a, see accompanying
STATEMENT OF SERVICE BY MAIL for time limits to answer.

**IF YOU FAIL TO ANSWER THE COMPLAINT** within the time stated, judgment will be entered against you for the relief demanded in the complaint.

Dated:     May 10, 2019
           Buffalo, New York

                                    **RUPP BAASE PFALZGRAF CUNNINGHAM LLC**
                                    Attorneys for Plaintiff

                                    By:_____
                                        Matthew D. Miller, Esq.
                                        Marco Cercone, Esq.
                                        James R. O'Connor, Esq.
                                        1600 Liberty Building
                                        424 Main Street
                                        Buffalo, New York 14202
                                        (716) 854-3400

STATE OF NEW YORK
SUPREME COURT : COUNTY OF ERIE

LAUREN HAIDON,

Plaintiff,

vs.                                                    Index No.:

FENSTER ENTERPRISES, INC., NATIONAL
BUILDING PRODUCTS, INC., NATIONAL
BUILDING PRODUCTS AND SERVICES, INC.
f/k/a/ PELLA PRODUCTS, INC.,
HERBERT A. KRIEGH, YOMI OJO, and
GRETCHEN CORDONNIER,

Defendants.

## COMPLAINT

Plaintiff, Lauren Haidon, by and through her attorneys, Rupp Baase Pfalzgraf

Cunningham LLC, as and for her complaint against defendants Fenster Enterprises, Inc.,

National Building Products, Inc., National Building Products and Services, Inc. f/k/a Pella

Products, Inc., Herbert Kriegh, Yomi Ojo, and Gretchen Cordonnier, alleges as follows:

### PROCEDURAL ALLEGATIONS

1.      At all times hereinafter mentioned, Lauren Haidon ("Plaintiff" or

"Lauren") was a natural person with a primary residence in the County of Erie, State of

New York.

2.      Upon information and belief, at all times hereinafter mentioned,

Fenster Enterprises, Inc. ("Fenster") was and is a foreign business corporation formed pursuant

to the laws of the State of Indiana.

3.      Upon information and belief, at all times herein relevant, Fenster has

conducted business in the State of New York, has entered into contracts to supply goods or

services in the State of New York, and has maintained a place of business in the State of

New York located at 2580 Walden Avenue, Buffalo, New York.

4.     Upon information and belief, at all times hereinafter mentioned, Fenster

has regularly transacted and solicited business in the State of New York, has engaged in other

persistent courses of conduct within the State of New York, and has derived substantial revenue

from services rendered within the State of New York.

5.     Upon information and belief, at all times hereinafter mentioned, National

Building Products, Inc. ("NBPI") was and is a foreign business corporation formed pursuant to

the laws of the State of Indiana.

6.     Upon information and belief, at all times herein relevant and although not

authorized to do so, NBPI employees conducted business and performed services in the State of

New York and which had an impact in the State of New York.

7.     Upon information and belief, at all times hereinafter mentioned, NBPI has

engaged in a persistent course of conduct in the State of New York which had an impact in the

State of New York.

8.     Upon information and belief, NBPI conducted business and performed

services under the assumed name Pella Windows and Doors until on or about March 14, 2019.

9.     Upon information and belief, at all times hereinafter mentioned, National

Building Products and Services, Inc. f/k/a Pella Products, Inc. ("PPI") was and is a foreign

business corporation formed pursuant to the laws of the Commonwealth of Pennsylvania.

10.     Upon information and belief, at all times herein relevant and although not

authorized to do so, PPI employees conducted business and performed services in the State of

New York and which had an impact in the State of New York.

- 2 -

11.     Upon information and belief, at all times hereinafter mentioned, PPI has engaged in a persistent course of conduct within the State of New York which had an impact in the State of New York.

12.     Upon information and belief, at all times hereinafter mentioned, defendant Herbert Kriegh ("Kriegh") was and is a natural person with a primary residence located in the State of Indiana, and has used and possessed real property in the County of Erie, State of New York.

13.     Fenster, NBPI, and PPI hereinafter will be referred to collectively as the "Kriegh Companies."

14.     Upon information and belief, at all times hereinafter mentioned, the Kriegh Companies were independent distributors of products and services, including windows and doors, for Pella Corporation ("Pella").

15.     Upon information and belief, at all times hereinafter mentioned, Pella was a national manufacturer of windows and doors through three channels of distribution, including independent distributors such as the Kriegh Companies.

16.     Upon information and belief, at all times hereinafter mentioned, Fenster has owned, used, or possessed real property situated within the State of New York.

17.     Upon information and belief, at all times hereinafter mentioned, Kriegh was and is the sole shareholder, owner, and President and Chief Executive Officer of the Kriegh Companies.

18.     Upon information and belief, at all times hereinafter mentioned, defendant Yomi Ojo ("Ojo") was and is a natural person with a primary residence located in the Commonwealth of Pennsylvania.

- 3 -

19.     Upon information and belief, at all times hereinafter mentioned, Ojo was and is employed by the Kriegh Companies and held himself out as the Human Resource Manager, and/or was performing human resource services for the Kriegh Companies, including but not limited to Fenster, in the County of Erie, State of New York.

20.     Upon information and belief, at all times hereinafter mentioned, Ojo engaged in a persistent course of conduct and performed services for the Kriegh Companies which had an impact in the State of New York.

21.     Upon information and belief, at all times hereinafter mentioned, defendant Gretchen Cordonnier ("Cordonnier") was and is a natural person with a primary residence located in the Commonwealth of Pennsylvania.

22.     Upon information and belief, at all times hereinafter mentioned, Cordonnier was and is employed by the Kriegh Companies and held herself out as the Chief Financial Officer for the Kriegh Companies, including but not limited to Fenster, in the County of Erie, State of New York.

23.     Upon information and belief, at all times hereinafter mentioned, Cordonnier engaged in a persistent course of conduct and performed services for the Kriegh Companies which had an impact in the State of New York.

## BACKGROUND FACTS AND CIRCUMSTANCES

### General Allegations

24.     Fenster was and is an independent distributor of products and services, including windows and doors, for Pella, in Western New York.

25.     NBPI and PPI were and are independent distributors of products and services, including windows and doors, for Pella, in Indiana and Pennsylvania, respectively.

- 4 -

26. Lauren is a female.

27. Kriegh is a male, and, upon information and belief, is the highest level of management at the Kriegh Companies insofar as he is the sole shareholder, owner, and President and Chief Executive Officer.

28. Fenster employed Lauren from on or about October 1, 2017 through April 6, 2018, when she was terminated.

29. Lauren, among other employees, were jointly employed the Kriegh Companies insofar as she was ordered to and did perform services for each of the Kriegh Companies inside and outside the State of New York.

30. Kriegh, Ojo, and Cordonnier, among others, are jointly employed the Kriegh Companies insofar as they performed shared services for each of the Kriegh Companies.

31. At all times during Lauren's employment, Kriegh was her direct supervisor and possessed actual power and authority over employment decisions and the terms and conditions of Lauren's employment.

32. At all times during Lauren's employment, Ojo and Cordonnier possessed actual power and authority over employment decisions and the terms and conditions of her employment.

33. Upon information and belief, from the time that Kriegh's ownership of Fenster began, Kriegh has engaged in a pervasive pattern of severely offensive and relentless sexual harassment of female employees, among other unlawful discriminatory conduct.

34. Upon information and belief, from the time that Kriegh's ownership of Fenster began, Kriegh has engaged in quid pro quo sexual harassment of female employees.

### Lauren's First Meeting with Kriegh

35.     In or around September 2017, Kriegh, previously unknown to Lauren, contacted her through Linkedin indicating that he was looking to hire an executive assistant and whether she knew anyone or was herself interested.

36.     Lauren responded that she was interested.

37.     On or around September 21, 2017, Lauren met Kriegh for an interview for the executive assistant position.

38.     In addition to discussing the open position and some of the job requirements, including some travel to Indiana, Kriegh inappropriately and unlawfully asked Lauren whether she was married, whether she had a boyfriend, and how old she was.

39.     During this initial meeting, Lauren admitted to Kriegh that she was going through a difficult custody battle with her ex-husband regarding her daughter and Kriegh inquired as to whether that, or anything else, would be an impediment to Lauren traveling to Indiana at times to work in his office there with him.  She responded that although her daughter was her first priority, it would not be a problem.

40.     Toward the end of the meeting, Kriegh told Lauren that she would be a great fit for the position.

41.     Lauren subsequently received an email and a telephone call from Ojo, on behalf of the Kriegh Companies, offering her the executive assistant position, which she accepted.  She was to start her new job on or about October 1, 2017.

- 6 -

## Lauren's First Work for the Kriegh Companies

42.     Lauren's first task upon accepting the new job was to fly to Indiana on or about October 1, 2017 in order to meet additional Kriegh Companies employees that worked for Kriegh.

43.     Although this trip was in furtherance of and required for her new employment, she was required to purchase her own flight, for which she was never reimbursed.

44.     Upon arriving in South Bend, Indiana, Kriegh picked Lauren up at the airport.  Kriegh, Lauren's new boss and the owner and CEO of the Kriegh Companies, hugged her without permission or consent.

45.     Kriegh drove Lauren from the airport to his home.  Upon arrival, he brought her bags into his house, and showed her to the kitchen and living room area where there already was a bottle of wine opened, with two glasses set out.

46.     Kriegh then showed Lauren around his single-story house, which included the master bedroom on the first floor.  Kriegh then put Lauren's bags in the master bedroom, and told her, without consent or permission, that she was required to stay at his home with him, not at a hotel on this work trip.  Kriegh stated to Lauren that he only works from home; he does not go into the office.

47.     At no time during the interview or at any time prior to this trip did Kriegh ask Lauren if she would feel comfortable staying at his home or offer to make arrangements for accommodations.

48.     Upon hearing this from Kriegh, Lauren understandably became nervous, anxious, and concerned.  She was in a strange place, alone, with her new boss, without access to a car or any knowledge of her exact location.

-7-

Case 1:19-cv-01010-LJV-JJM Document 1-1 Filed 07/31/19 Page 15 of 46

49.     Kriegh sat down on the bed, and without permission or consent took both of Lauren's hands in his. Kriegh told Lauren how he couldn't wait for her to get there; that he felt like a little kid filled with so much excitement; and that he hoped she enjoyed her new job, or words to that effect.

50.     Then, without permission or consent from Lauren, Kriegh, who is large in stature at approximately 6'7'' and 300 pounds, forcibly pulled Lauren on top of him and unbuckled the belt on her jeans.

51.     Stricken with feelings of severe panic, and feeling she had no other choice at the time, Lauren succumbed to his advances for fear of what Kriegh might do to her and her job if she attempted to escape or stop what he was doing.

52.     Kriegh then forcibly rolled Lauren over onto her back, putting his large body on top of hers.

53.     **Kriegh next took his clothes off, took Lauren's clothes off, and had sexual intercourse with her, without permission or consent.**

54.     Not long after Kriegh forcibly had sex with Lauren without consent, he approached her and asked "how do you like being my girlfriend," or words to that effect. When Lauren looked at Kriegh scared and confused, he responded by saying "yes, girlfriend. Get used to hearing that."

55.     Subsequently, that same day, Kriegh watched Lauren's every move. He constantly asked who she was texting on her phone, refusing her any privacy.

56.     Kriegh then walked over to the cabinet above the refrigerator, ***pulled out a loaded gun***, told Lauren that there was a loaded gun in each room in the house, and that he had **"no issue blowing someone's head off,"** or words to that effect.

- 8 -

57.     Lauren was severely panicked and anxious for her safety and her job.

Given her position and Kriegh's actual power and authority over her under the circumstances,

Lauren reasonably perceived that she had no option but to succumb to everything Kriegh was

demanding and doing for fear of retribution or retaliation.

58.     Later that evening, Kriegh demanded that Lauren sleep in bed with him.

**Kriegh grabbed the back of her head and pulled her in with force, kissing her, without**

**consent, and shoving his tongue in her mouth so hard that his teeth hit hers**.

59.     The following day, on or about October 2, 2017, after Lauren observed

Kriegh's Monday morning narcissistic conference call with employees, **Kriegh again**

**summoned Lauren to his bedroom and forcibly had sex with her, without permission or**

**consent**.

60.     That night, Kriegh demanded that Lauren accompany him to Ruth's Chris

Steakhouse, and introduced her to their dining company as his girlfriend, without her permission

or consent.

61.     During Lauren's time in Indiana with Kriegh, Kriegh repeatedly impressed

upon her and instructed her that her loyalty to him was extremely important; it was not an option.

He demanded that Lauren report to him, and him only.  **Kriegh repeatedly instructed that**

***Lauren could not speak to Ojo or Cordonnier* – the Kriegh Companies' Human Resource**

**Manager and CFO – about anything that went on**, or about anything other than scheduling

calls, and that was a strict rule of his.

62.     **Kriegh told Lauren that if she ever went behind his back and**

**betrayed him by speaking to either Ojo or Cordonnier about anything he was doing, he**

**would fire her**.  Kriegh admitted to Lauren that Cordonnier knew of Kriegh's past similar

conduct with his immediately prior executive assistant (referred to herein only by her initials,
"HM"), and that Cordonnier had warned Kriegh after he hired Lauren to keep this one
professional.

### Lauren's First Report to Fenster's Office in Buffalo

63.     Upon returning to Buffalo the following week, Lauren reported to
Fenster's Buffalo office and went about her work.

64.     Lauren was not provided a work space of her own; she was forced to work
alongside Kriegh. Before lunch, Kriegh called Lauren over to look at something on his
computer. However, Kriegh wasn't really on his computer at all. Instead, Kriegh had an iPad in
front of the computer screen. When Kriegh told Lauren to "look at that," she leaned forward to
see what he was referring to. **Kriegh then slid his hand in between her legs and grabbed her
vaginal area, without permission or consent**.

65.     Later that day, after having lunch together out of the office to discuss the
events of Lauren's first work trip to Indiana, Kriegh stated that he needed to stop at his Lancaster
apartment. Kriegh asked Lauren to help him carry bags from his apartment to his car. However,
when Lauren entered the apartment with him, Kriegh turned and locked the door behind him.
Kriegh's bedroom was directly across from the entrance. **Kriegh forcibly pushed Lauren
backwards into the bedroom and onto the bed, and forcibly kissed her without permission
or consent**. While on top of Lauren, Kriegh stated "what's there to discuss," or words to that
effect, then began removing her clothes without permission or consent. **Kriegh then had sexual
intercourse with Lauren under duress, without her permission or consent**.

66.     Because Lauren was refused a work space of her own, throughout her
employment at the Kriegh Companies, and specifically at the Fenster Buffalo office, she was

- 10 -

forced to sit across from Kriegh at his desk. Kriegh often whispered or mouthed to Lauren **"I want to fuck you," "I want you to suck my big cock," or "tell me how much you like my big cock,"** throughout the course of a workday.

67.     If Lauren did not react to Kriegh's derogatory, sexually charged, and harassing comments as Kriegh wanted, Kriegh became enraged. If Lauren did not oblige and/or succumb to his advances, Kriegh's mood changed rapidly, and he became volatile and threatening to Lauren.

### Lauren's First Termination

68.     In or around October 2017, Lauren began feeling ill. She started losing hair, experiencing severe pain in her legs and knees, and her joints often were swollen.

69.     In or around late October, Lauren received a call from Ojo to discuss Kriegh's behavior with Lauren and with other employees. Ojo asked Lauren directly whether there was a relationship with Kriegh that was more than professional. For fear of retribution and losing her job, Lauren denied it. Lauren did, however, discuss with Ojo Kriegh's hostile, abusive, and discriminatory behavior toward and with other employees, and employees' general fear of Kriegh. Lauren and Ojo agreed that they would not speak about the conversation they had in order to protect Lauren from breaking Kriegh's rule of silence.

70.     The same evening, Kriegh became upset with Lauren. Lauren was set to see her doctor the following morning. Lauren texted Ojo and asked him to call her in the morning before her appointment.

71.     When Ojo called the next morning, Cordonnier also was on the phone. Lauren explained her severe fear of Kriegh, and his stern instructions never to speak to them about anything. Lauren acknowledged the unlawful sexual acts Kriegh forced Lauren to engage

- 11 -

Case 1:19-cv-01010-JLJM  Document 1-1  Filed 07/31/19  Page 19 of 46

in. Lauren emotionally told Ojo and Cordonnier that she needed her job. Because of her fear for

Kriegh, Lauren specifically requested that neither Ojo nor Cordonnier talk to Kriegh about their

conversation until Lauren could talk to them again after her appointment; Lauren was petrified of

what Kriegh's reaction might be and that she would lose her job.

72.    While at her doctor's appointment, Kriegh repeatedly and unnecessarily

texted and called Lauren, demanding to know where she was.

73.    While in the examining room, the Physician's Assistant that was

examining Lauren was notified by a nurse that Kriegh was in the waiting area, looking for her.

The nurse made it clear she was concerned because of Kriegh's agitated demeanor.

74.    The Physician's Assistant asked Lauren if she should call the police, but

Lauren said no for fear of retribution and retaliation from Kriegh.

75.    When Lauren's appointment was over, Kriegh was still in the waiting

area, his face bright red and was shaking his leg. Lauren was petrified. Kriegh approached

Lauren and told her he received a call from Ojo and Cordonnier. As Kriegh spoke he was

getting louder and louder. Lauren's Physician's Assistant that treated her was still present,

picked up the phone, and mouthed "police." Lauren shook her head "no" because she was

fearful of Kriegh and what would happen. Kriegh then told Lauren that she broke the biggest

rule he had for her and that she went behind his back and betrayed him.

76.    Kriegh then told Lauren, in the waiting room in public, that she was fired

effective immediately in retaliation for reporting his conduct to the Human Resource Manager

and CFO – the only other people she possibly could report his harassment to because Kriegh was

the CEO.

- 12 -

Case 1:19-cv-01010-LJV-JJM   Document 1-1   Filed 07/31/19   Page 20 of 46

77. Despite terminating Lauren, Kriegh continued to text and call her after she went home.

78. Upon arriving home, Lauren lay in bed and wasn't feeling well. Kriegh showed up at her home and let himself in. Kriegh accosted Lauren and demanded answers about why she reported his conduct. With no other choice and in fear for her safety, Lauren apologized while crying uncontrollably.

79. **Kriegh then laid down next to Lauren and told her she could have her job back if she "sucked his cock" to show him she was sorry**. In need of her job, she submitted to Kriegh's unlawful request. Before Kriegh left, **he demanded that she never go to Ojo or Cordonnier again**.

80. After Kriegh gave Lauren her job back, and whenever she was in Buffalo and Kriegh was in Indiana, Kriegh excessively contacted her via FaceTime in order to make sure that Lauren was home alone. **Kriegh repeatedly demanded that Lauren show him her breasts and vagina over FaceTime. Kriegh demanded to see that she did not shave her vaginal area** when he was gone because if she did, to him, it would mean Lauren was disobeying Kriegh and was having a sexual relationship with someone who was not her supervisor.

### Another Trip to Indiana

81. In or around November 2017, Lauren was required to accompany Kriegh on another trip to Indiana. During this trip, Kriegh told Lauren that he is a sex addict, which frightened her.

- 13 -

82. During this trip, Kriegh went into another drunken rage. At Kriegh's home, in front of witnesses, Kriegh repeatedly made inappropriate comments and raised his voice at Lauren, causing the others to leave.

83. Later that evening, Kriegh yelled and scolded Lauren for not coming into the bedroom with him to sleep, telling him how "disrespectful" she was, implying she owed him more as her boss.

84. Lauren told Kriegh that she did not want to go into the bedroom. Kriegh insisted, then offered to sleep on the couch himself.

85. Lauren awoke in the bedroom several hours later to Kriegh crawling into bed with her. Although Kriegh mandated that when he made Lauren sleep in the same bed with him she never wear clothes, she had clothes on this night.

86. When Kriegh got in bed, **he started to take off Lauren's pants, without permission or consent, because she was violating his "rule."**

87. Lauren sat up immediately and objected, to which Kriegh replied "I'm helping you get ready for bed," or words to that effect, contrary to her objection and even though Lauren had been sleeping already for several hours.

88. Lauren pulled her pants back up, and Kriegh rolled over in a rage and fell asleep, drunk.

89. The following morning, **Lauren was awakened by Kriegh grabbing her breasts and rubbing his erect penis against her from behind, all without Lauren's permission or consent and against her wishes.**

90. **Kriegh took off Lauren's pants and forcibly put his penis inside of her, without permission or consent.** For fear of retribution or retaliation, and for fear of her

- 14 -

safety, Lauren succumbed to Kriegh's unlawful advance. When Kriegh finished, he stated "that makes everything better," implying he will not have to discipline her any more, until the next time.

### Kriegh's Constant Hostile Conduct

91.    Kriegh created an environment at the Kriegh Companies, including Fenster, where the "norm" consisted of daily hostile belittlement of employees, including, but not limited to, Lauren.

92.    Because other employees knew that Lauren was Kriegh's "Executive Assistant," they sought her out whenever she was alone in Kriegh's office to commiserate over the intolerable working conditions.

93.    Many employees often came to Lauren to discuss Kriegh's demeaning and discriminatory conduct, including individuals that will be referred to only as J.S., D.D., B.B., and S.M., to name a few.

94.    These employees, among others, repeatedly expressed to Lauren their individual and collective fear of Kriegh and their reluctance to oppose his actions for fear of retribution or retaliation. They often asked Lauren to try to calm Kriegh down and reason with him.

95.    During Lauren's employment, employees at Fenster resigned at an alarming rate as a result of Kriegh's conduct and the intolerable working conditions. So much so that Kriegh stated how he wanted to "fuck everyone" that resigned by trying to ruin their reputations in the community and industry.

96.    Kriegh saw Lauren as an extension of himself, and forbade her from having lunch or going out with anyone else in the office and expressly and impliedly instructed

- 15 -

her to stay separate and not to discuss the terms and conditions of their employment with each other.

### The Final Termination

97.     In or about early 2018, Lauren had surgery on her back and required some time out of work.

98.     During this time, Kriegh had a "rule" that when he was not in the Buffalo office, Lauren was not to be there either.  Kriegh forbade her from speaking to other employees when he was not there.

99.     In or about late March 2018, as a result of Kriegh's relentless harassment, hostility, discrimination, and extreme and outrageous conduct, and despite Kriegh's refusal to permit Lauren to report his offensive and unlawful conduct to Ojo and/or Cordonnier, Lauren called Ojo and Cordonnier.  During this call, Lauren told Ojo and Cordonnier about Kriegh's inappropriate and unacceptable behavior.

100.    Despite this report, and despite having actual knowledge of Kriegh's long history of illegal, discriminatory, harassing, and severely outrageous conduct, Ojo and Cordonnier did nothing to address the behavior.  In fact, upon information and belief, Ojo and Cordonnier reported Lauren's call to Kriegh in order to protect Kriegh instead of to protect Lauren.

101.    On or about April 6, 2018, Lauren's employment was terminated by Kriegh, with the support and assistance of Ojo and Cordonnier, in direct retaliation for her opposition to the defendants' severe, pervasive, humiliating, discriminating, harassing, extreme, and outrageous conduct.

- 16 -

Case 1:18-cv-01030-JMM Document 1-1 Filed 07/31/19 Page 24 of 46

805815/2019

RECEIVED NYSCEF: 05/10/2019

### The Federal Lawsuit

102.    Shortly after Lauren was fired, she sent a Linkedin message to Pella's Chief Executive Officer, Tim Yaggi advising him that she was the victim of sexual harassment during her employment.

103.    Upon information and belief, Pella initiated an investigation into Lauren's allegations.

104.    Upon information and belief, as a result of and in reliance on the results of its investigation, Pella concluded that Kriegh breached the various agreements under which the Kriegh Companies operated the distributorships for Pella and Pella took steps to immediately terminate those agreements upon conclusion of its investigation.

105.    Upon information and belief, the Kriegh Companies and Kriegh commenced litigation in the United States District Court for the Middle District of Pennsylvania styled *Pella Products, Inc. et al. v. Pella Corporation*, Case No. 18-cv-01030-ARC (the "Pella Lawsuit") seeking to block the termination of their distributorship agreements with Pella.

106.    In the course of the Pella Lawsuit, various employees of Pella submitted declarations, based upon their personal knowledge and sworn to under the pains and penalties of perjury, describing the Pella investigation into Kriegh's conduct and Pella's conclusions.

107.    On May 30, 2018, Pella filed the Declaration of Theresa H. Touchton ("Touchton"), Counsel for Pella (the "Touchton Declaration").

108.    The Touchton Declaration set forth that, among other things:

-    [Touchton] engaged outside counsel . . . to investigate [Lauren's] allegations.    The investigative team interviewed a number of witnesses and gathered emails and texts from several of the witnesses, which they provided to [Touchton].

- 17 -

- [Touchton] reviewed the email and text messages and assembled a packet of materials that [she] provided to Annette Bravard of Pella's leadership team. A true and correct copy of the materials I provided for review to Ms. Bravard from review are attached to Ms. Bravard's declaration. The packet of materials included text messages that [Lauren] and her father, Patrick Haidon, had provided to the investigative team in the course of the investigation. It also included the notes that [outside counsel] had taken during their witness interviews.

- [Touchton] also drafted a memorandum for consideration by Ms. Bravard summarizing the course and findings of the investigative team's investigation. The memorandum identifies the people who were interviewed and the information they provided.

- On May 4, 2018, [] Kriegh visited Pella and met with Ms. Bravard and Paul Parks. At some point during the meeting, [Touchton] was asked to join Ms. Bravard, Mr. Parks and Mr. Kriegh. Mr. Kriegh and [Touchton] previously had met and also he has been present during various events at which [Touchton] presented. [Touchton] was asked to review a stack of printouts that Mr. Kriegh had brought to the meeting. The stack included printouts of text messages between Kriegh and Ms. Haidon, as well as photographs of gifts and other items. [Touchton] reviewed the materials in the course of the meeting, listened to Mr. Kriegh's explanation of the materials [she] reviewed, and with his permission, asked Mr. Kriegh questions . . . .

- In the course of the portion of the meeting that [Touchton] attended, Mr. **Kriegh confirmed that he had had two sexual relationships with personal assistants that began and ended nearly simultaneously with each woman's employment**.

109.    On May 30, 2018, Pella filed the Declaration of Annette Bravard ("Bravard"), the Corporate Vice President of Sales for Pella (the "Bravard Declaration").

110.    The Bravard Declaration set forth that, based upon the investigation and information summarizing information collected during the investigation, which was provided to her by Theresa Touchton—attorney for Pella—among other things:

- 18 -

- [Bravard] believed that Kriegh was engaging in serious sexual misconduct in the course of his duties as owner of the three Pella distributorships . . . . [Bravard] also believed that Kriegh's behavior was obvious to his employees and to the public, and had become—or would inevitably become—negatively associated with the Pella brand in the regions where Kriegh's distributorships operate.

- On May 4, 2018, [Bravard] met with Kriegh in person. Paul Parks attended that entire meeting with [her]. Theresa Touchton later joined the meeting to review information that Kriegh brought to the meeting with him.

- At the beginning of the meeting, [Bravard] explained to Kriegh that Pella had received information that led its leadership team to believe Kriegh had engaged in sexual relationships with at least two of his personal assistants, and had engaged in sexually demeaning and inappropriate conduct around both males and females in the distributorships' workplaces.

- [Bravard] told Kriegh he would have an opportunity to provide information in response to these allegations, but that Pella was presently prepared give him one of two options: a transition agreement pursuant to which Pella would purchase Kriegh's distributorships, or immediate termination of Kriegh's distributorship agreements for cause.

- When given the opportunity to respond, **Kriegh admitted right away that he had had sexual relationships with both [Lauren] and another former personal assistant** . . . . It was apparent to [Bravard] that Kriegh believed there was no problem with having sexual relationships with subordinate employees that he had hired and supervised . . . .

- In the course of the conversation, Kriegh insisted that he had not created an inappropriate workplace environment. He stated that because he, as the business owner, trained the branches' staff members on issues of sexual harassment and appropriate conduct in the workplace, he could not have created an inappropriate environment.

- Ultimately, [Pella's] discussion with Kriegh did not change the preliminary opinion that [Bravard] had reached, with input from Pella's leadership team, before going into the meeting. **[Bravard] concluded, with support from the Pella management team, that Kriegh was engaging in serious**

FILED: ERIE COUNTY CLERK 05/10/2019 04:23 PM
Case 1:19-cv-01018-JLJMc Document 4.1 Filed 07/31/19 Page 27 of 46. INDEX NO. 805815/2019

NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 05/10/2019

**sexual misconduct in the course of his duties as owner and day-to-day manager of three Pella distributorships. The conduct was inextricably connected to the operation of the branches. The conduct was corroborated by multiple witnesses (some of whom Kriegh himself described as credible) and by Kriegh himself over the course of the meeting, which lasted for several hours.**

- Pella's ultimate decision to terminate Kriegh's distributorship agreements for cause was based on the exercise of its business judgment, based on Pella's assessment of the long-term interest of the Pella system as a whole. Several factors informed the decision, including:

  o **Kriegh admitted to having back-to-back sexual relationships with personal assistants he hired and directed to work out of his home in Indiana. These employees were direct reports dependent on Kriegh to be hired and for continued employment. The timing of those sexual relationships (as reported to [Bravard] by Kriegh) was almost completely coextensive with his working relationships.**

  o **Pella's investigation had resulted in additional credible reports—from sources other than [Lauren], and who Kriegh himself agreed were reliable—that Kriegh regularly used hypersexualized language in the workplace and made sex a frequent subject of conversation in the [Kriegh Companies'] workplace.**

  o **Pella's investigation had also uncovered in credible reports—from sources other than Lauren—that Kriegh retaliated against [Kriegh Companies] employees who complained about his workplace behavior.**

- It was further clear to [Bravard], both from the information collected during Pella's investigation and from Kriegh's own admissions, that Kriegh's conduct was not a secret within his companies and was almost certainly not a secret in the relatively small communities to which he sold Pella products.

- Pella concluded that Kriegh's conduct violated the distributorship agreements Pella had with his businesses, including because Kriegh had willfully engaged in conduct harmful to the goodwill and reputation of the Pella brand.

- 20 -

Case 1:19-cv-01018-JLS-JJM Document 1-1 Filed 07/31/19 Page 28 of 46

Accordingly, when Kriegh refused the terms of the transition agreement that Pella offered to him, Pella terminated its distributorship agreements with his distributorships for cause.

111. On May 30, 2018, Pella filed the Declaration of Paul Parks ("Parks"), the

Director of Distribution Development and Shared Services for Pella (the "Parks Declaration").

112. The Parks Declaration set forth that, among other things:

- [Parks] was asked by Pella to participate in a meeting with Annette Bravard and Herbert Kriegh that took place on May 4, 2018. [Parks] understood that Bravard and other members of Pella's leadership team had received what they believed to be credible reports that Kriegh had engaged in inappropriate conduct with employees of one or more of the Pella distributorships that Kriegh owns. However, [Parks] had not been given any details regarding the allegations— aside from some high-level talking points for the May 4 meeting, [Parks] had not reviewed any documents, summary memoranda, text messages, or emails about these allegations prior to [his] meeting with Bravard and Kriegh on May 4.

- At the beginning of the meeting with Kriegh, [Parks] listened as Bravard explained to Kriegh that Pella had received reports that he had engaged in sexual relationships with at least two of his subordinates and had engaged in sexually demeaning and inappropriate conduct around both males and females in the distributorships' workplaces. Bravard also explained to Kriegh . . . that while Kriegh would be given the opportunity to respond to the allegations, Pella was presently prepared give him one of two options: a transition agreement pursuant to which Pella would purchase Kriegh's distributorships, or immediate termination of Kriegh's distributorship agreements for cause.

- After being given the opportunity to respond, **Kriegh immediately admitted he had had sexual relationships with two of his previous personal assistants**.

- Bravard and [Parks] listened to Kriegh respond to the allegations that had been made against him for well over an hour. Following a break, Theresa Touchton, Pella's counsel, joined our conversation.

- 21 -

Case 1:19-cv-01010-LJV-JJM Document 1-1 Filed 07/31/19 Page 29 of 46. INDEX NO. 805815/2019

RECEIVED NYSCEF: 05/10/2019

- Even though Kriegh admitted he had had sexual relationships with two of his most recent direct reports, he denied that he had engaged in any wrongdoing.

- Even so, at the conclusion of [the] conversation with Kriegh, [Parks'] opinion was that Kriegh's behavior was inevitably damaging to Pella's brand and goodwill. **[Parks] was particularly concerned because of Kriegh's position of obvious and significant power over the two women he had slept with and the fact that he admitted his personal relationship with Haidon seemed to overlap nearly exactly with the period of time when she worked with him.** ([Parks] later learned the same was true of his relationship with [Hanna] Mapa). It was also very concerning to [Parks] that Kriegh never took personal responsibility for anything [they] were discussing. He spent much of the conversation blaming others—Haidon and her father, who he claimed were out to get him, or others in the Buffalo location who he thought were angry at him for work-related reasons. He did not seem to accept personal responsibility for his conduct or appreciate the concerns it caused Pella.

- After listening to Kriegh share his side of the story for well over an hour, [Parks] conferred with Bravard outside Kriegh's presence. [Parks] learned that Pella's investigation revealed credible reports from sources other than the two employees Kriegh had slept with that Kriegh engaged in sexually inappropriate behavior in the workplace. In addition, [Parks] learned that Kriegh offered both personal assistants he had slept with money in exchange for signing a release of claims and non-disclosure agreement.

- Based on all of this information, [Parks] agreed with Pella's decision that Kriegh's behavior breached Pella's agreements with Kriegh's distributorships such that immediate termination of those agreements was warranted.

## FIRST CAUSE OF ACTION

### SEXUAL HARASSMENT – HOSTILE WORK ENVIRONMENT
### IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW
### AGAINST FENSTER, NBPI, PPI, KRIEGH, OJO, AND CORDONNIER

113.    Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

114.    Lauren is a member of a protected class.

115.    The Kriegh Companies' workplaces were pervaded with unwelcome sexual harassment. Comments and actions by Kriegh were sexually charged and made Lauren uncomfortable and a prisoner in her own workplace because of her sex.

116.    Kriegh's harassment of Lauren was sufficiently severe and pervasive so as to alter the terms and conditions of Lauren's employment and created a hostile work environment.

117.    The hostility and extreme harassment of Lauren by Kriegh extended well beyond the normal supervisor-subordinate relationship.

118.    Kriegh's conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile, offensive, and/or abusive.

119.    Lauren did, in fact, find Kriegh's conduct to be hostile, offensive, abusive, controlling, harassing, and emotionally devastating.

120.    Kriegh knew about the harassment because he perpetrated it, and because he was the sole shareholder, President, and CEO of the Kriegh Companies.

121.    The Kriegh Companies knew of Kriegh's unlawful conduct because he was the sole shareholder, President, and CEO.

- 23 -

Case 1:19-cv-01010-JJM-JJM   Document 1-1   Filed 07/31/19   Page 31 of 46

122.    The Kriegh Companies, Ojo, and Cordonnier knew or should have known about the harassment because they had knowledge of Kriegh's longstanding pattern of behavior at Fenster before and during Lauren's employment.

123.    Despite knowledge of the sexual harassment, defendants took no steps to remediate it.

124.    By reason of this unlawful sexual harassment subjecting Lauren to a hostile work environment, and the failure to address the sexual harassment or hostile work environment in violation of the New York State Human Rights Law, among other things, Lauren is entitled to compensatory damages, including back pay and compensation for her severe emotional distress in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees.

## SECOND CAUSE OF ACTION

### AIDING & ABETTING SEXUAL HARASSMENT – HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW AGAINST OJO

125.    Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

126.    Ojo knew or should have known about the unlawful sexual harassment because it was reported to him on multiple occasions, and because he was the Human Resource Manager for the Kriegh Companies.

127.    Ojo knew or should have known about the harassment because he had knowledge of Kriegh's longstanding pattern of behavior at the Kriegh Companies before and during Lauren's employment.

128.    Ojo possessed the power and authority to hire and fire employees.

- 24 -

129. Despite knowledge of the sexual harassment, Ojo took no steps to remediate it, instead taking steps to protect the defendants.

130. By ignoring and/or intentionally rejecting legitimate reports of unlawful sexual harassment and/or by reason of his failure to address the unlawful sexual harassment or hostile work environment, Ojo aided and abetted violations of the New York State Human Rights Law entitling Lauren to damages in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees.

### THIRD CAUSE OF ACTION

### AIDING & ABETTING SEXUAL HARASSMENT – HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW AGAINST CORDONNIER

131. Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

132. Cordonnier knew or should have known about the unlawful sexual harassment because it was reported to her on multiple occasions, and because she was the CFO for the Kriegh Companies.

133. Cordonnier knew or should have known about the harassment because she had knowledge of Kriegh's longstanding pattern of behavior at the Kriegh Companies before and during Lauren's employment.

134. Cordonnier possessed the power and authority to hire and fire employees.

135. Despite knowledge of the sexual harassment, Cordonnier took no steps to remediate it, instead taking steps to protect the defendants.

136. By ignoring and/or intentionally rejecting legitimate reports of unlawful sexual harassment and/or by reason of her failure to address the unlawful sexual harassment or

- 25 -

hostile work environment, Cordonnier aided and abetted violations of the New York State

Human Rights Law entitling Lauren to damages in an amount not less than $5,000,000, along

with all costs, disbursements, and attorneys' fees.

### FOURTH CAUSE OF ACTION

### SEXUAL HARASSMENT – QUID PRO QUO
### IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW
### AGAINST FENSTER, NBPI, PPI, KRIEGH, OJO, AND CORDONNIER

137.    Lauren repeats and realleges the allegations in the foregoing paragraphs of

this complaint as if set forth fully herein.

138.    Lauren is a member of a protected class.

139.    Defendants subjected Lauren to unlawful and unwelcome sexual advances

by Kriegh, who was the Kriegh Companies' sole shareholder, President, and CEO, and had direct

supervisory authority over Lauren.

140.    Lauren did not welcome, consent to, or give permission for Kriegh's

sexual advances.

141.    Kriegh's harassment and advances of Lauren were based upon sex.

142.    Lauren's reactions to Kriegh's advances affected a tangible aspect of the

terms and conditions of her employment because Kriegh became hostile and threatened to or did,

in fact, terminate her if she rejected the advances.

143.    Lauren did, in fact, find Kriegh's conduct to be hostile, offensive, abusive,

controlling, harassing, and emotionally devastating.

144.    Kriegh knew about the unlawful advances because he perpetrated them.

145.    The Kriegh Companies knew of Kriegh's unlawful conduct because

Kriegh was the sole shareholder, President, and CEO.

- 26 -

146.    Ojo and Cordonnier knew or should have known about the unlawful and unwelcome sexual advances by Kriegh because they had knowledge of Kriegh's longstanding pattern of behavior at the Kriegh Companies before and during Lauren's employment, and because it was reported to them on multiple occasions.

147.    Despite knowledge of the unlawful and unwelcome sexual advances toward Lauren by Kriegh, defendants took no steps to remediate them, instead takings steps to protect the defendants.

148.    By reason of this unlawful quid pro quo sexual harassment, and the failure to address the unlawful quid pro quo sexual harassment in violation of the New York State Human Rights Law, among other things, Lauren is entitled to compensatory damages, including back pay and compensation for her severe emotional distress in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees.

## FIFTH CAUSE OF ACTION

### AIDING & ABETTING SEXUAL HARASSMENT – QUID PRO QUO IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW AGAINST OJO

149.    Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

150.    Ojo knew or should have known about the unlawful and unwelcome sexual advances toward Lauren by Kriegh because they were reported to him on multiple occasions, and because he was the Human Resource Manager for the Kriegh Companies.

151.    Ojo knew or should have known about the unlawful and unwelcome sexual advances toward Lauren by Kriegh because Ojo had knowledge of Kriegh's longstanding pattern of similar conduct at the Kriegh Companies before and during Lauren's employment.

- 27 -

152.    Ojo possessed the power and authority to hire and fire employees.

153.    Despite knowledge of the unlawful and unwelcome sexual advances toward Lauren by Kriegh, Ojo took no steps to remediate them, instead takings steps to protect the defendants.

154.    By ignoring and/or intentionally rejecting legitimate reports of unlawful and unwelcome sexual advances toward Lauren by Kriegh and/or by reason of his failure to address the unlawful and unwelcome sexual advances, Ojo aided and abetted violations of the New York State Human Rights Law entitling Lauren to damages in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees.

## SIXTH CAUSE OF ACTION

### AIDING & ABETTING SEXUAL HARASSMENT – QUID PRO QUO IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW AGAINST CORDONNIER

155.    Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

156.    Cordonnier knew or should have known about the unlawful and unwelcome sexual advances toward Lauren by Kriegh because they were reported to her on multiple occasions, and because she was the CFO for the Kriegh Companies.

157.    Cordonnier knew or should have known about the unlawful and unwelcome sexual advances toward Lauren by Kriegh because Cordonnier had knowledge of Kriegh's longstanding pattern of similar conduct at the Kriegh Companies before and during Lauren's employment.

158.    Cordonnier possessed the power and authority to hire and fire employees.

- 28 -

159.     Despite knowledge of the unlawful and unwelcome sexual advances toward Lauren by Kriegh, Cordonnier took no steps to remediate them, instead takings steps to protect the defendants.

160.     By ignoring and/or intentionally rejecting legitimate reports of unlawful and unwelcome sexual advances toward Lauren by Kriegh and/or by reason of her failure to address the unlawful and unwelcome sexual advances, Cordonnier aided and abetted violations of the New York State Human Rights Law entitling Lauren to damages in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees.

### SEVENTH CAUSE OF ACTION

**SEX DISCRIMINATION**
**IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW**
**AGAINST FENSTER, NBPI, PPI, KRIEGH, OJO, AND CORDONNIER**

161.     Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

162.     Lauren is a member of a protected class.

163.     Defendants treated Lauren differently because of her sex and as a result, she is protected by the New York Human Rights Law.

164.     Lauren was qualified for her job as an executive assistant and consistently performed her job well.

165.     Lauren was terminated on the basis of her sex, and because of Kriegh's animosity toward women that report sexual harassment and discrimination.

166.     The Kriegh Companies, acting through Kriegh, Ojo, and Cordonnier, unlawfully terminated Lauren because of her sex in violation of the New York State Human Rights Law.

- 29 -

167. By reason of this unlawful termination, Lauren is entitled to compensatory damages, including back pay and compensation for her severe emotional distress in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees.

### EIGHTH CAUSE OF ACTION

### AIDING & ABETTING SEX DISCRIMINATION
### IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW
### AGAINST OJO

168. Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

169. Ojo knew or should have known about the unlawful sex discrimination because it was reported to him on multiple occasions, and because he was the Human Resource Manager for the Kriegh Companies.

170. Ojo knew or should have known about the unlawful sex discrimination because Ojo had knowledge of Kriegh's longstanding pattern of similar conduct at the Kriegh Companies before and during Lauren's employment.

171. Ojo possessed the power and authority to hire and fire employees.

172. Ojo participated in Lauren's termination.

173. Despite knowledge of the unlawful sex discrimination, Ojo took no steps to prevent or remediate it, instead taking steps to protect the defendants.

174. By reason of the ignorance and/or intentional rejection of legitimate reports of sex discrimination, including failing to investigate and participation in the same, Ojo aided and abetted violations of the New York State Human Rights Law entitling Lauren to damages in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees.

- 30 -

## NINTH CAUSE OF ACTION

### AIDING & ABETTING SEX DISCRIMINATION
### IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW
### AGAINST CORDONNIER

175.   Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

176.   Cordonnier knew or should have known about the unlawful sex discrimination because it was reported to her on multiple occasions, and because she was the CFO for the Kriegh Companies.

177.   Cordonnier knew or should have known about the unlawful sex discrimination because Cordonnier had knowledge of Kriegh's longstanding pattern of similar conduct at the Kriegh Companies before and during Lauren's employment.

178.   Cordonnier possessed the power and authority to hire and fire employees.

179.   Cordonnier participated in Lauren's termination.

180.   Despite knowledge of the unlawful sex discrimination, Cordonnier took no steps to prevent or remediate it, instead taking steps to protect the defendants.

181.   By reason of the ignorance and/or intentional rejection of legitimate reports of sex discrimination, including failing to investigate and participation in the same, Cordonnier aided and abetted violations of the New York State Human Rights Law entitling Lauren to damages in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees.

## TENTH CAUSE OF ACTION

### UNLAWFUL RETALIATION
### IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW
### AGAINST FENSTER, NBPI, PPI, KRIEGH, OJO, AND CORDONNIER

182.    Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

183.    Lauren engaged in protected activity when she opposed Kriegh's unlawful sexual harassment, advances, and discrimination on multiple occasions.

184.    Lauren engaged in protected activity when she reported to the defendants, on multiple occasions, Kriegh's unlawful sexual harassment, advances, and discrimination.

185.    Defendants knew that Lauren engaged in protected activity because she opposed the Kriegh Companies' CEO's conduct, and reported it to the Human Resource Manager and CFO.

186.    Defendants ignored Lauren's reports of Kriegh's unlawful sexual harassment, advances, and discrimination and terminated her instead.

187.    The Kriegh Companies terminated Lauren because she reported Kriegh's unlawful sexual harassment, advances, and discrimination.

188.    The Kriegh Companies' termination decision was made by Kriegh, Ojo, and/or Cordonnier, who acted for the Kriegh Companies.

189.    At the time the decision was made to terminate Lauren, Kriegh knew about her reports to Ojo and Cordonnier of the sexual harassment, advances, and discrimination.

190.    Upon information and belief, defendants terminated Lauren, and offered her a severance agreement, to shut her up and remove her and her reports of sexual harassment, advances, and discrimination from the Kriegh Companies' workplaces.

- 32 -

191.    Defendants' conduct is likely to and did deter and/or dissuade employees from engaging in protected activity.

192.    Because defendants violated New York State Human Rights Law when they terminated Lauren for opposing and reporting sexual harassment, advances, and discrimination, Lauren is entitled to compensatory damages, including back pay and compensation for her severe emotional distress in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees.

## ELEVENTH CAUSE OF ACTION

### AIDING & ABETTING UNLAWFUL RETALIATION
### IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW
### AGAINST OJO

193.    Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

194.    Ojo violated New York State Human Rights Law by terminating Lauren for reporting unlawful sexual harassment, advances, and discrimination.

195.    By, among other things, terminating Lauren without investigating her reports of sexual harassment, advances, and discrimination, Ojo aided and abetted violations of the New York State Human Rights Law entitling Lauren to damages in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees.

## TWELFTH CAUSE OF ACTION

### AIDING & ABETTING UNLAWFUL RETALIATION
### IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW
### AGAINST CORDONNIER

196.    Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

- 33 -

Case 1:19-cv-01010-JJM-JJM Document 1-1 Filed 07/31/19 Page 41 of 46
INDEX NO. 805815/2019
RECEIVED NYSCEF: 05/10/2019

197. Cordonnier violated New York State Human Rights Law by terminating Lauren for reporting unlawful sexual harassment, advances, and discrimination.

198. By, among other things, terminating Lauren without investigating her reports of sexual harassment, advances, and discrimination, Cordonnier aided and abetted violations of the New York State Human Rights Law entitling Lauren to damages in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees.

## THIRTEENTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### AGAINST FENSTER, NBPI, PPI, AND KRIEGH

199. Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

200. When Lauren accepted the position at the Kriegh Companies as Kriegh's executive assistant, she was eager to start and succeed so that she could provide for her daughter as a single mother.

201. During her employment, Lauren worked hard, but was also the victim of outrageous sexual assault, battery, harassment, advances, and discrimination. But, Lauren persevered for fear of retribution from Kriegh and out of a desire to make it as a single mother providing for her daughter.

202. When the sexual assault, battery, harassment, advances, and discrimination became too much for any reasonable person, Lauren opposed it and reported it.

203. As a direct result of breaking Kriegh's rule of not speaking to Ojo or Cordonnier and reporting Kriegh's sexual assault, battery, harassment, advances, and discrimination, Kriegh continued to recklessly and intentionally harass Lauren.

- 34 -

204.    First, the Kriegh Companies and Kriegh unlawfully terminated Lauren and then offered her job back only if she performed a sex act on Kriegh.

205.    The Kriegh Companies and Kriegh attempted to silence Lauren and instructed her not to and forbade her from talking to other employees, including Ojo and Cordonnier.

206.    The Kriegh Companies and Kriegh attempted to silence Lauren and instructed her not to and forbade her from being in his Buffalo office when Kriegh was not there.

207.    Kriegh acted to intimidate and silence Lauren to protect himself and because of her opposition to and reports of the sexual assault, battery, harassment, advances, and discrimination.

208.    Kriegh acted to intimidate and silence Lauren and used threats of retaliation, retribution, and the loss of her job and thus her being unable to provide for herself and her daughter as a means to control Lauren.

209.    Kriegh's conduct was intentional and/or displayed a callous and reckless disregard for the humiliation and emotional distress that his conduct has caused Lauren.

210.    Kriegh's conduct was not only unlawful, but was extreme and outrageous and beyond all possible measures of decency as to be considered intolerable in a civilized community.

211.    Lauren has received and is receiving ongoing treatment for the emotional distress that Kriegh intentionally and/or recklessly caused her.

212.    By reason of the extreme and outrageous conduct and intentional infliction of emotional distress, Lauren has suffered emotional harm and is entitled to damages in an amount not less than $5,000,000, plus punitive damages.

- 35 -

## FOURTEENTH CAUSE OF ACTION

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### AGAINST FENSTER, NBPI, PPI, KRIEGH, OJO, AND CORDONNIER

213. Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

214. When Lauren accepted the position at the Kriegh Companies as Kriegh's executive assistant, and only executive assistant, she was eager to start and succeed so that she could provide for her daughter as a single mother.

215. Defendants' owed a special duty to Lauren because she was Kriegh's only executive assistant, the only employee forced to share Kriegh's desk with him, and the defendants knew of Kriegh's history of similar conduct.

216. During her employment, Lauren worked hard, but was also the victim of outrageous sexual assault, battery, harassment, advances, and discrimination. But, Lauren persevered for fear of retribution from Kriegh, for fear for her own safety, and out of a desire to make it as a single mother providing for her daughter.

217. When the sexual assault, battery, harassment, advances, and discrimination became too much for any reasonable person, Lauren opposed it and reported it.

218. As a direct result of breaking Kriegh's rule of not speaking to Ojo or Cordonnier and reporting Kriegh's sexual assault, battery, harassment, advances, and discrimination, Kriegh continued his unlawful and offensive conduct.

219. Kriegh knew or should have known that his conduct was unlawful.

220. Because of Kriegh's longstanding history of such conduct, Ojo and Cordonnier knew or should have known that his conduct toward Lauren was unlawful.

- 36 -

Case 1:19-cv-01010-LJV-JJM   Document 1-1   Filed 07/31/19   Page 44 of 46

221. Upon receiving the reports of Kriegh's conduct from Lauren, Ojo and Cordonnier knew or should have known that Kriegh's conduct was unlawful.

222. Kriegh's conduct was in grossly negligent disregard for Lauren's well-being and caused severe emotional distress to Lauren.

223. Kriegh's conduct was not only unlawful, but was extreme and outrageous and beyond all possible measures of decency as to be considered intolerable in a civilized community.

224. Ojo and Cordonnier's failure to act to remediate or stop the conduct was in grossly negligent disregard for Lauren's well-being.

225. Lauren was subjected to multiple traumatic events that caused her to fear for her own safety.

226. Lauren has received and is receiving ongoing treatment for the emotional distress that Kriegh intentionally and/or recklessly caused her.

227. By reason of the extreme and outrageous conduct and negligent infliction of emotional distress, Lauren has suffered emotional harm and is entitled to damages in an amount not less than $5,000,000, plus punitive damages.

## FIFTEENTH CAUSE OF ACTION

### SEXUAL ASSAULT AND BATTERY
### AGAINST KRIEGH

228. Lauren repeats and realleges the allegations in the foregoing paragraphs of this complaint as if set forth fully herein.

229. Kriegh, on multiple occasions, engaged in forcible, unwanted, and nonconsensual sexual contact with Lauren, which she found offensive, threatening, humiliating, and degrading, among other things.

- 37 -

230. Kriegh, on multiple occasions, engaged in instances of offensive, unwanted physical touching, including of a sexual nature and including grabbing her breasts and vaginal area.

231. Lauren did not consent to Kriegh's offensive physical touching.

232. In light of the foregoing, Kriegh committed multiple assaults and batteries on Lauren.

233. By reason of the multiple instances of sexual assault and battery on Lauren, Lauren is entitled to damages, including but not limited to compensatory damages, and damages for emotional pain and suffering and loss of enjoyment of life against Kriegh in an amount not less than $5,000,000, plus punitive damages.

**WHEREFORE**, plaintiff Lauren Haidon, by and through her attorneys Rupp Baase Pfalzgraf Cunningham LLC, hereby demands judgment against defendants Fenster Enterprises, Inc., National Building Products, Inc., National Building Products and Services, Inc. f/k/a Pella Products, Inc., Herbert Kriegh, Yomi Ojo, and Gretchen Cordonnier, jointly and severally:

1.  On her first cause of action, in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees; and

2.  On her second cause of action, in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees; and

3.  On her third cause of action, in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees; and

4.  On her fourth cause of action, in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees; and

5.  On her fifth cause of action, in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees; and

- 38 -

Case 1:19-cv-01010-LJV-JJM   Document 1-1   Filed 07/31/19   Page 46 of 46

6.  On her sixth cause of action, in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees; and

7.  On her seventh cause of action, in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees; and

8.  On her eighth cause of action, in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees; and

9.  On her ninth cause of action, in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees; and

10.  On her tenth cause of action, in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees; and

11.  On her eleventh cause of action, in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees; and

12.  On her twelfth cause of action, in an amount not less than $5,000,000, along with all costs, disbursements, and attorneys' fees; and

13.  On her thirteenth cause of action, in an amount not less than $5,000,000, plus punitive damages; and

14.  On her fourteenth cause of action, in an amount not less than $5,000,000, plus punitive damages; and

15.  On her fifteenth cause of action, in an amount not less than $5,000,000, plus punitive damages; and

16.  Awarding such other and further damages and relief as this Court may deem just and proper.

Dated:  May 10, 2019
Buffalo, New York

RUPP BAASE PFALZGRAF CUNNINGHAM LLC
Attorneys for Plaintiff

By:  _____
Matthew D. Miller, Esq.
Marco Cercone, Esq.
James R. O'Connor, Esq.
1600 Liberty Building
424 Main Street
Buffalo, New York 14202
(716) 854-3400

- 39 -